**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**SUSAN LOUISE WOODS,**
            **Plaintiff,**

**v.**                                              **CIVIL ACTION NO. 2:15-15852**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**
            **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Orders entered December 8, 2015, and January 5, 2016 (Document No. 4 and 7.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 13.)

The Plaintiff, Susan Louise Woods (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on April 5, 2012 and January 24, 2014, respectively (protective filing dates), alleging disability as of April 4, 2012, due to biliary cirrhosis, osteoarthritis of back, hips, and neck, colitis, bicuspid valve disease with heart murmur, hypertension, hypothyroidism, osteopenia, eczema, bladder leakage, depression, and stress.[1] (Tr. at 59, 71, 100, 176, 182.) The

---

[1] On her form Disability Report - Appeal, dated December 17, 2012, Claimant asserted that she experienced increased back and hip pain and was "more depressed". (Tr. at 217.)

claims were denied initially and upon reconsideration. (Tr. at 84-88, 92-102.) On December 17, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 103-104.) A hearing was held on March 7, 2014, before the Honorable Sabrina M. Tilley. (Tr. at 25-58.) By decision dated June 12, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 9-24.) The ALJ's decision became the final decision of the Commissioner on October 14, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on December 4, 2015, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§

2

404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a <u>prima facie</u> case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(C) Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

3

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). [2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, April 4, 2012. (Tr. at 14, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "osteoporosis and obesity," which were severe impairments. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform a full range of work at all exertional levels, as follows:

> [C]laimant has the residual functional capacity to perform light work except she

can occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; can frequently, but not continuously, handle, finger, and feel; can be exposed occasionally to extreme cold, extreme heat, and vibrations; and can never be exposed to hazards.

(Tr. at 17, Finding No. 5.) At step four, the ALJ found that Claimant was capable of performing past relevant work as a candle maker, candle molder, and inspector/hand packer. (Tr. at 19, Finding No. 6.) On this basis, benefits were denied. (Tr. at 20, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on August 6, 1955, and was 58 years old at the time of the administrative hearing, March 7, 2014. (Tr. at 152, 165.) Claimant had at least a high school

education, one year of college, and was able to communicate in English. (Tr. at 175, 177, 398.) She previously worked in a candle factory, doing quality control/inspecting product, making candles, shipping product, and data entry. (Tr. at 19, 54-55, 177-178, 196.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence, and discusses it below in relation to Claimant's arguments.

*Evidence Prior to Claimant's Alleged Onset Date, April 4, 2012*:

Dr. Carlotta R. Evans, M.D.

By correspondence dated January 16, 2008 and July 2, 2010, Dr. Carlotta R. Evans, M.D., Claimant was advised that her bone density tests were unchanged, but there was some weakening of her bones necessitating a prescription of Fosamax. (Tr. at 237-238.) Provided to the Appeals Council, Claimant's medical records from Dr. Evans indicated that she had bone density scans on June 10, 2010 (Tr. at 456-457.) and on September 26, 2013 (Tr. at 458-459.).

Dr. James D. Shumate, D.O.

Dated January 22, 2008, a report indicated that Claimant was seen by her primary care physician, Dr. James D. Shumate, D.O., for a follow-up visit regarding her nerve conduction studies, labs and EMG. (Tr. at 305.) Those tests proved negative; speculating a nerve impingement, Claimant was placed on Neurontin 300 mg for a week. (Id.) On February 20, 2008, due to complaints of hip pain, Dr. Shumate referred Claimant for an x-ray of her right hip: there were no abnormal bone changes noted, except for minimal osteophyte formation at the greater trochanter. (Tr. at 388, 390.) Due to her hip pain, Claimant found no relief with Lodine, and was instead prescribed Relafen 750 bid and Lortab 5/500 for breakthrough pain; Lisinopril was continued for her hypertension. (Tr. at 304.) On March 20, 2008, a report from Summersville Memorial Hospital

indicated that Claimant's right hip pain was improving through physical therapy; she was discharged after having completed eleven sessions with recommendation to go on a home exercise program. (Tr. at 389.) A follow-up visit with Dr. Shumate on July 21, 2008 indicated that Claimant's pain had worsened, and she experienced swelling in her ankles and abdomen; suspecting a side effect to Relafen, Claimant was switched to Lodine for her pain management. (Tr. at 303.) The report indicated that Claimant had seen a GI in June and reported that her liver was doing well. (Id.) On October 16, 2009, during a follow-up appointment with Dr. Shumate, Claimant was to be scheduled for an MRI of her brain due to her complaints of vertigo. (Tr. at 302.) At Summersville Memorial Hospital, on October 23, 2009, Claimant underwent an MRI of her brain. (Tr. at 322, 368.) The findings were normal, though there was minimal periventricular white matter, probably representing ischemic changes. (Id.) That same date, Claimant also underwent an echocardiogram which also revealed otherwise normal in functioning, though the findings further showed "mild biatrial enlargement, mild right sided hypertension, mild aortic stenosis bordering on the mild-to-moderate range, mild regurgitation of the aortic and mitral valves, and sinus rhythm." (Tr. at 323-325, 369-371.) Another visit to Dr. Shumate on November 11, 2009 indicated that Claimant's dizziness had "somewhat improved", though she "still gets dizzy with changes in position." (Tr. at 301.)

On May 10, 2010, Dr. Shumate referred Claimant for another echocardiogram which was otherwise unchanged from the previous one in October: "no significant diastolic dysfunction. Perhaps early/very mild diastolic dysfunction. Mild left atrial enlargement. High normal right sided pressures. Overall mild aortic valve stenosis although the aortic valve appears to be fairly widely patent again suggesting there is no significant or marked aortic valve stenosis. Mild regurgitation of the aortic and mitral valves. Regular rate and rhythm throughout the examination."

(Tr. at 319-321, 361-363.)

Claimant had a follow-up visit with Dr. Shumate on June 18, 2010, with complaints of neck pain and fatigue. (Tr. at 299-300.) Suspecting a low pulse rate as the cause of her fatigue, Dr. Shumate decreased her Metoprolol from 50 mg and placed her on Lisinopril 20 mg. (Tr. at 299.) Claimant was also placed on Skelaxin for her neck pain. (Id.) A follow-up appointment on January 6, 2011 indicated that Claimant was still very fatigued and suffering from neck pain. (Tr. at 297-298.) Skelaxin was continued and Lisinopril was switched to Cozaar 50 mg to reduce side effects. (Tr. at 297.)

Claimant went back to see Dr. Shumate on August 29, 2011 and represented that she was doing fairly well, though her heart murmur seemed louder, necessitating another echocardiogram to evaluate the progress of her aortic stenosis. (Tr. at 295-296.) Dr. Shumate noted several masses on Claimant's left forearm, which seemed similar to previous lipomas; due to her complaints of a sudden severe back pain that resolved that morning, x-rays of her thoracic spine and chest were ordered. (Id.) On September 9, 2011, Claimant underwent several examinations: due to Claimant's complaints of back pain and chest pain, Dr. Shumate ordered x-rays of her thoracic spine and chest. (Tr. at 317-318, 344-345.) There were no obvious fractures or dislocation of Claimant's thoracic spine, though mid and lower thoracic spondylosis was present. (Tr. at 317, 344.) Claimant's lungs were clear, with mild cardiomegaly. (Tr. at 318, 345.) An ultrasound of Claimant's left forearm indicated "probable small lipomas." (Tr. at 316, 346.) An echocardiogram of Claimant was "technically adequate-to-good", revealing an "ejection fraction [] normal range, mild biatrial enlargement, normal right sided pressures, no stenotic valves, specifically the aortic valve, mild regurgitation of the aortic and mitral valves, mild calcific sclerosis of the aortic valve and mitral annulus, and regular rate and rhythm." (Tr. at 315, 347-349.)

On November 1, 2011, Claimant presented to Dr. Shumate again due to her concern of a skin lesion on her forehead and a knot on her right foot with discoloration of her right great toenail. (Tr. at 293-294.) Dr. Shumate referred Claimant to have the lesion removed, although Claimant did not want any further treatment on her foot at the time. (Tr. at 293.) On November 9, 2011, a Pathology Report from the Charleston Area Medical Center indicated that there was no malignancy found in a skin lesion that was removed from Claimant's forehead. (Tr. at 336-337.)

Dr. Steven R. Matulis, M.D.

On April 6, 2004, Dr. Steven R. Matulis, M.D. performed a needle biopsy of Claimant's liver which revealed primary biliary cirrhosis.[3] (Tr. at 241.) On September 28, 2009, Dr. Matulis had Claimant undergo a CT scan of her abdomen with contrast due to her complaints of fatigue and her history of biliary cirrhosis. (Tr. at 244-245.) The scan indicated cirrhosis with mild splenomegaly and a question of splenic varices suggesting portal hypertension, and borderline enlarged periaortic lymph nodes versus unopacified varices, however, Claimant's pancreas, lungs and appendix appeared normal. (Id.) On June 7, 2010, Dr. Matulis also performed a colonoscopy of Claimant, including a biopsy, due to Claimant's complaint of chronic diarrhea. (Tr. at 253-259.) Though the colonoscopy results were normal, the biopsy results indicated early collagenous colitis. (Tr. at 253-254.) By letter dated January 24, 2011, Dr. Matulis provided an update on Claimant's treatment and condition to her primary care physician, Dr. Shumate, in which Dr. Matulis indicated that Claimant was diagnosed with cirrhosis of the liver secondary to primary biliary cirrhosis and nonalcoholic steatoheptitis, and collangenous colitis, which were being treated with Ursodiol 250 mg, and Colestid, although Claimant discontinued her Colestid use as diarrhea was not currently an issue. (Tr. at 260-261.) On February 2, 2011, Claimant underwent an ultrasound at

---

[3] The Court notes that the exhibit was marked "Page 1 of 2", however, there was no second page in the record.

Summersville Regional Medical Center, at Dr. Matulis's referral; there were no significant findings regarding her liver and pancreas, and her right kidney showed prominent collecting system, but otherwise unremarkable. (Tr. at 262.) A follow-up appointment on October 24, 2011 with Sarah C. Fletcher, C-Fnp, Charleston Area Medical Center, indicated that Claimant's collagenous colitis was controlled with Colestid and with Bently PRN and that she denied any problems. (Tr. at 274-277, 441-444.)

<u>Dr. Bradley Willis, M.D.</u>

On March 28, 2012, Claimant presented to Dr. Bradley Willis, M.D., at Summersville Regional Medical Center in order to takeover care from Dr. Shumate; Claimant continued her care with Dr. Matulis every three to four months regarding her primary biliary cirrhosis.[4] (Tr. at 282.) Due to complaints of neck pain and stiffness, a radiology report dated March 28, 2012 concerning Claimant's cervical spine indicated cervical spondylosis, and no evidence of bony misalignment. (Tr. at 314, 330, 391.) That same date, due to complaints of pain, an x-ray taken of Claimant's left shoulder indicated minor calcific tendonitis. (Tr. at 328.)

*Evidence After the Alleged Onset Date, April 4, 2012*:

<u>Sarah C. Fletcher, C-Fnp</u>

On April 19, 2012, Claimant was seen by Sarah C. Fletcher, C-Fnp, Charleston Area Medical Center, for follow-up treatment on PBC/NASH and collagenous colitis; she presented with complaints of abdominal swelling, bloating and diarrhea. (Tr. at 278-281, 437-440.) Claimant returned to see Nurse Fletcher on October 25, 2012 for follow-up case on PBC/NASH with known cirrhosis. (Tr. at 417-420, 433-436.) An ultrasound revealed no hepatoma and ascites was negative,

---

[4] The Court notes that this exhibit indicated it is "Page 1 of 2", however, there is no second page to this exhibit in the record.

and labs remained stable. (Tr. at 417, 433.) Due to a rash in her umbilicus, determined to be candidiasis, Nystatin powder was recommended. (Id.) As a result of a recent episode of edema and ascites, Claimant agreed to use Aldactone and Lasix together, per Dr. Matulis's suggestion. (Id.) On April 25, 2013, Claimant returned to Nurse Fletcher complaining of increased edema and ascites; the Aldactone and Lasix helped, but caused cramping. (Tr. at 421-424, 429-432.) Claimant also complained of dysphagia and odynophagia, and pruritis. (Tr. at 421, 429.) Though Claimant's prior EGD in 2009 was normal, another was planned for her dysphagia and to screen for varices. (Tr. at 421, 424, 429, 432.) For the pruritis and allergies, Claimant was recommended to try Allegra and Claritin. (Tr. at 424, 432.) On May 8, 2013, Claimant underwent another EGD performed by Dr. Matulis; the results were normal. (Tr. at 425-426.)

Dr. Bradley Willis, M.D.

On June 26, 2012, Claimant returned to the Summersville Regional Medical Center for a routine check-up with Dr. Bradley Willis, M.D. (Tr. at 287-291.) Claimant represented that she was doing really well with no major complaints, though anemic. (Tr. at 287.) Claimant returned to Dr. Willis on February 13, 2013, for a check-up and sinus infection; Claimant had no other complaints. (Tr. at 414-416.) On May 22, 2013, Claimant returned to Dr. Willis with complaints of left knee pain that had persisted for a month, as well as left leg swelling, without a known injury. (Tr. at 404-406.) Dr. Willis referred her for an x-ray, suspecting lateral meniscus tear. (Tr. at 405.) A follow-up appointment with Dr. Willis on August 22, 2013 indicated that Claimant was "getting along ok" and had no complaints; the left knee was not hurting since the swelling went down. (Tr. at 412.) On September 26, 2013, Claimant returned to Dr. Willis complaining that she had an episode where she could not catch her breath and of pain from her chest into her back, and radiated to the right shoulder. (Tr. at 448.) Because of her precordial chest pain, Dr. Willis referred

12

Claimant to Dr. Marvin J. Wurth, M.D. for a stress test, performed on September 27, 2013. (Tr. at 450-451.) Dr. Wurth concluded that Claimant tolerated the stress test well and left in stable condition. (Tr. at 451.) On January 2, 2014, Claimant returned to Dr. Willis for a follow-up and reported no new complaints, she was to continue her medications as usual and to return in another three months. (Tr. at 446-447.)

Dr. Willis provided a Medical Assessment of Ability to do Work-Related Activities (Physical) for Claimant, dated March 27, 2014. (Tr. at 452-455.) Dr. Willis opined that Claimant could lift/carry a maximum of 15 lbs. occasionally and a maximum of 30 lbs. frequently, limited by her hernia as well as back pain. (Tr. at 452.) Dr. Willis opined that Claimant could walk a total of three hours out of an eight-hour day, but only for twenty minutes without interruption as limited by her knee pain and back pain, but can walk 100 years without rest. (Id.) Dr. Willis opined that Claimant could sit for a total of six hours in an eight-hour day, but for thirty minutes without interruption, but she would have to move her position frequently. (Tr. at 453.) Dr. Willis opined that Claimant could never climb, kneel or crawl, but can occasionally balance, stoop, and crouch; her knee pain limits her kneeling and crawling. (Id.) Dr. Willis provided no environmental restrictions. (Id.) Due to her shoulder replacement done in 1980, Dr. Willis found Claimant's ability to reach in all directions (including overhead) limited, but unlimited in gross and fine manipulations and feeling. (Tr. at 454.) Finally, Dr. Willis found no limitations to Claimant's ability to see, hear or speak. (Tr. at 455.)

Consultative Examination Report:

On August 29, 2012, Dr. Arturo Sabio, M.D. provided a consultative examination of Claimant. (Tr. at 392-396.) Dr. Sabio reviewed Claimant's prior x-rays and her medical history, and during a physical examination, noted that Claimant walks with a normal gait and did not

require ambulatory aids. (Tr. at 393-394.) Though morbidly obese, Claimant's blood pressure was 120/70. (Id.) Dr. Sabio found that Claimant had a normal heart rhythm, without murmurs, gallops or rubs. (Tr. at 394.) Dr. Sabio noted Claimant was tender in her right hip, and of the metacarpophalangeal joints in both hands, as well as swelling in the distal interphalangeal joints of both hands. (Id.) Dr. Sabio noted tenderness of Claimant's cervical, thoracic and lumbar spine, without kyphosis or scoliosis (Id.), though range of motion was normal. (Tr. at 396.) Dr. Sabio found Claimant euthyroid (Tr. at 395.); neurological examination was normal. (Tr. at 396.) There was no muscle atrophy or weakness. (Id.)

Consultative Examination Report:

On September 10, 2012, Claimant presented to Larry J. Legg, M.A. for a mental status examination. (Tr. at 397-402.) Claimant drove herself to the examination, was found to be cooperative with the interview and was clean and suitably dressed. (Tr. at 397.) With regard to her claims of depression, Claimant reported that her mother "had passed away in May and that she lost her job at Bright of American after 27 years two years ago." (Tr. at 398.) Claimant reported that she had never been treated for mood disorder. (Id.) Claimant reported that her stress is caused by worry over her health, the family finances and other matters on a daily basis, but she had never been treated for her anxiety disorder. (Id.) Mr. Legg's mental status examination, and specifically with regard to concentration, persistence, and pace, revealed that Claimant was within normal limits. (Tr. at 400.) Mr. Legg found Claimant's social functioning to be within normal limits. (Id.) For daily activities, Claimant reported that she does household chores and childcare responsibilities. (Id.) Based on his interview of Claimant, Mr. Legg diagnosed her with major depressive disorder, single episode, moderate, and generalized anxiety disorder, and gave her a fair prognosis; Mr. Legg opined that Claimant could manage her own finances. (Tr. at 401.)

State Agency Psychiatric Review Technique:

Dated September 19, 2012, John Todd, Ph.D., performed a PRT of Claimant and found that her Affective Disorders and Anxiety-Related Disorders caused no restrictions in Claimant's activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace, or caused any repeated episodes of decompensation. (Tr. at 64.) Dr. Todd found no evidence to establish "C" criteria of listings. (Id.) Dr. Todd based his opinion on the mental status examination, infra, as well as Claimant's responses to the ADL form. (Id.) A subsequent PRT, dated November 19, 2012, by Jeff Boggess, Ph.D., reported the same conclusions as Dr. Todd. (Tr. at 77.)

State Agency RFC Assessment:

Dated November 20, 2012, Dr. Narendra Parikshak, M.D., provided a physical RFC assessment of Claimant to perform a modified range of light work. (Tr. at 78-80.) Dr. Parikshak opined that Claimant could lift, carry, push and/or pull 20 pounds occasionally and ten pounds frequently; stand and/or walk for six hours and sit for six hours during an eight-hour workday. (Tr. at 78.) Claimant could occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, and crawl. (Tr. at 79.) Dr. Parikshak opined that Claimant's limitations were a result of obesity, and that her limitations with climbing ladders/ropes/scaffolds were due to her hand pain and swelling of joints. (Id.) Dr. Parikshak opined that Claimant could perform frequent handling, which was limited due to her hands having tender and swollen joints; he found Claimant was unlimited with regard to reaching in any direction. (Id.) Claimant had no visual or communicative limitations. (Id.) However, Dr. Parikshak opined that Claimant was to avoid concentrated exposure to cold, vibration, and fumes, odors, dusts, gases, poor ventilation, etc., as well as avoid exposure to hazards. (Tr. at 80.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to consider and evaluate the opinion of her primary care physician, Dr. Bradley Willis. (Document No. 12 at 5-8.) Claimant asserts that the ALJ neither mentioned nor assigned weight to Dr. Willis's opinion, despite the fact that this evidence was submitted while this case was still pending before the ALJ, and was entered into the administrative record as Exhibit 13F as documented in the List of Exhibits that accompanied the ALJ's decision. (Id. at 6.) The ALJ's disregarding Claimant's treating physician's opinion violated her obligation pursuant to 20 C.F.R. §§ 404.1527(b)-(c), 416.927(b)-(c). (Id. at 7.) In addition, the ALJ's failure to acknowledge Dr. Willis's opinion has also led to her failure to provide "good reasons" for according less weight to a treating source opinion as required by the Regulations and Rulings. (Id.) Claimant asserts that Dr. Willis provided significant standing and walking limitation that were not accepted into the ALJ's RFC assessment. (Id.) Claimant contends that the ALJ failed to comply with the applicable regulations and rulings by ignoring Dr. Willis's opinion, and thereby failing to weigh his opinion with the rest of the relevant evidence. (Id. at 8.)

In response, the Commissioner asserts that this Court can still meaningfully review the ALJ's decision finding Claimant not disabled, despite the fact that the ALJ did not specifically address and weigh Dr. Willis's opinion, because such an omission is harmless. (Document No. 13 at 10-14.) The Commissioner points out that Dr. Willis's RFC assessment was submitted after the hearing. (Id. at 1.) The Commissioner argues that remand to allow the ALJ to consider Dr. Willis's RFC is unnecessary because Claimant has not proved that his RFC assessment would have changed the ALJ's decision. (Id. at 10.) Per Shineski v. Sanders, 556 U.S. 396, 409 (2009), Claimant has the burden of showing any legal error that would have changed the decision. (Id. at

2, 11.) The Commissioner contends there are cases where the ALJ's failure to state the weight given to a medical opinion is harmless error, and asks this Court to adopt the rationale set forth therein: <u>Spurlock v. Astrue</u>, No. 3:12-cv-2062, 2013 WL 841474, at *21 (S.D.W. Va. 2013) the Court held that "an ALJ's failure to explicitly state the weight he gave to a particular medical opinion constitutes harmless error, so long as the weight given to the opinion is discernable from the decision and any grounds for discounting it are reasonably articulated."[5] (<u>Id</u>. at 11.) The Commissioner provides numerous instances the ALJ cited in her decision that support her contention that Claimant was not disabled and Dr. Willis's RFC assessment would not have changed the outcome. (<u>Id</u>. at 12-13.) In sum, Dr. Willis's opinion on Claimant's physical limitations were not consistent with the record, and in fact, contradicted the substantial evidence in the record, therefore, the ALJ's failure to assign any weight to Dr. Willis's opinion is harmless and should be upheld. (<u>Id</u>. at 13-14.)

Claimant finally asserts that the Commissioner's argument is nothing more than a post hoc rational in support of her own argument that was not included in the ALJ's decision; Claimant argues that the Commissioner's position is without merit because the ALJ's decision ignored Dr. Willis's opinion and failed to evaluate his opinion as a treating physician, which is contrary to law. (Document No. 14 at 1-4.) Claimant asserts that the Commissioner, like this Court, cannot substitute the ALJ's own reasoning and analysis with evidence not even considered by the ALJ. (<u>Id</u>. at 2.)[6] Claimant further contends that the Commissioner's reliance on the rationale in <u>Spurlock</u> case is misplaced because the ALJ therein, unlike in the matter <u>sub judice</u>, actually acknowledged

[5] Citing <u>Dover v. Astrue</u>, 2012 WL 1416410 *5 (W.D.N.C. Mar. 19, 2012); <u>Smith v. Astrue</u>, 2012 WL 78944 *16 (D.S.C. Jan. 18, 2012); <u>McFalls v. Astrue</u>, 2011 WL 4565474 *8 (W.D.N.C. Sept. 29, 2011).
[6] See <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947); see also <u>Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 50 (1983), citing <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 151, 168(1962); <u>Luster v. Astrue</u>, 2011 WL 2182719 (D.S.C. 2011); <u>Tanner v. Astrue</u>, 2011 WL 2313042 (D.S.C. 2011).

the treating physician's opinion, instead of speculating as to how the ALJ applied the law or considered how the opinion was supported by the evidence in the record, which renders the error not harmless.[7] (Id. at 4.) In closing, Claimant argues that the ALJ's ignoring Dr. Willis's treating physician opinion does not permit the Court adequate review of the weight that might have been assigned to that opinion, and further, deprives the Court of finding what good reasons may have been provided by the ALJ in giving the weight she might have assigned. (Id.)

Analysis

Claimant alleges that the ALJ erred in two ways: ignoring Dr. Willis's opinion, thereby giving no weight to it, and then failing to give good reasons therefor. (Document No. 12 at 5-8.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2013) (emphasis added). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment,

---

[7] Fox v. Colvin, 2015 U.S. App. LEXIS 21964 *11-12 (4th Cir. 2015).

the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2013). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2013). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a

whole to determine whether the Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In the instant matter, the ALJ noted that the treatment records concerning Claimant's biliary cirrhosis, colitis, a heart condition, hypertension, hypothyroidism, eczema, tendonitis of the left shoulder, back disorder, umbilical hernia, depression, and anxiety are medically monitored with conservative treatment (Tr. at 15.) The ALJ further noted that Claimant has never been hospitalized for her heart issues. (<u>Id</u>.) However, the ALJ does not mention any of Claimant's treating physicians by name, and with regard to the issue on appeal herein, makes no reference at all to Claimant's primary care physician's opinion, though it was noted in the administrative record as Exhibit 13F. Because the ALJ's decision made no mention of Claimant's treating physician's opinion, and therefore does not weigh that opinion against the rest of the medical evidence of record, the undersigned is left to guess as to what the ALJ found with regard to that opinion.

The undersigned agrees with Claimant that it is not the role of the courts to search for evidence and articulate reasons for a decision which were not furnished by the ALJ. See <u>Rhinehardt v. Colvin</u>, No. 4:12-CV-101-D, 2013 WL 2382303, *2 (E.D.N.C. May 30, 2013) (citation omitted) ("If the ALJ fails to explain why an impairment does not meet the listing criteria, the decision is deficient."); See also <u>Tanner v. Astrue</u>, C/A No. 2:10-1750-JFA, 2011 WL 4368547, *4 (D.S.C. Sept. 19, 2011) (stating "if the ALJ did not rationally articulate grounds for her decision, this court is not authorized to plumb the record to determine reasons not furnished by the ALJ"). In <u>Radford</u>

20

v. Colvin, 734 F.3d 288 (4th Cir. 2013), the Fourth Circuit stated that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling." 734 F.3d at 295 (citation omitted). "If the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or  explanation.'" Id. (quoting Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985)).

Further, the undersigned agrees with Claimant and declines to accept the Commissioner's invitation to implement the rationale espoused in Spurlock v. Astrue, 2013 WL 841474 (S.D.W. Va. Jan. 28, 2013), because the matters therein have no bearing on the situation in the case at bar: that ALJ at least mentioned the treating physician's opinion, and was not omitted from the decision altogether. In light of the aforementioned jurisprudence pertaining to opinions provided by treating physicians, the undersigned finds that the ALJ's decision is not in accordance with the regulations as a result of omitting evidence of and subsequent evaluation of Dr. Willis's opinion, and is therefore not supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 12.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **REVERSE** the final decision of the Commissioner, and **REMAND** this action to the Commissioner for further proceedings to correct the clear errors described herein.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District

Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: September 13, 2016.

Omar J. Aboulhosn
United States Magistrate Judge